UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X
                                                                 :
UNITED STATES OF AMERICA                                         :
                                                                 :
                          - v. –                                 :
                                                                 :        17 Cr. 782 (AT)
                                                                 :
JAMIE FRIERSON,                                                  :
                                                                 :
                  Defendant.                                     :
---------------------------------------------------------------- X

## THE GOVERNMENT'S SENTENCING MEMORANDUM

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

Aline R. Flodr
Sheb Swett
Sagar K. Ravi
Assistant United States Attorneys
      - Of Counsel -

# Table of Contents

**PRELIMINARY STATEMENT** ........................................................................... 1

**I.    The Offense Conduct** ................................................................................ 1

**II.   The Guidelines Calculation** ..................................................................... 6

  **A.   The Probation Department Calculation** ................................................. 6

  **B.   The Probation Department Correctly Found that the Defendant is a Career Offender** .................................................................................................. 8

  **C.   The Probation Department Correctly Applied the Threat of Death Enhancement** .. 10

  **D.   The Probation Department Correctly Declined to Apply the Acceptance of Responsibility Offense Level Reduction** ................................................ 12

**III.  Discussion** ............................................................................................... 14

  **A.   A Sentence of Incarceration is Necessary to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Impose Just Punishment** ................................. 15

    *1.   The Defendant's Conduct Caused Substantial Harm* ................................... 15

    *2.   The Defendant's Conduct Was Repeated* ..................................................... 16

  **B.   A Sentence of Incarceration is Necessary to Promote General and Specific Deterrence** ............................................................................................... 17

  **C.   The Defense Submission** ......................................................................... 18

**IV.   Conclusion** ............................................................................................. 18

## PRELIMINARY STATEMENT

Defendant Jamie Frierson ("the defendant") stands convicted of five counts of bank robbery following a jury trial before this Court in August of 2018.  For the reasons explained below, the Government submits that a sentence below the applicable Guidelines Range of 210 to 262 months' imprisonment (the "Guidelines Range"), as correctly calculated in the Presentence Investigation Report (the "PSR"), would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

The defendant challenges the U.S. Probation Department's Guidelines calculation, both by rehashing arguments that were made to, and rejected by, the jury at trial, and by consistently downplaying the enormous harm the defendant caused, harms that go well beyond the money that the defendant stole from the banks.  The defendant's request for time served, however, ultimately relates to the defendant's cancer diagnosis and the possibility that he may not survive much longer. While the Government recognizes the defendant's tragic situation, it respectfully submits that a sentence below the Guidelines Range, but that includes a substantial term of incarceration, is necessary to reflect, among other things, the seriousness of the defendant's conduct, the need to promote deterrence, and to protect the public from further crimes committed by the defendant.

### I.      The Offense Conduct

As the Court is well aware, the defendant committed a string of seven bank robberies in a two-week period in August 2017.  In particular, the defendant committed four bank robberies and three attempted bank robberies all on or around Broadway in Manhattan New York, and did so while on parole supervision for a 2012 conviction for possession of a forged instrument in the 1st degree.  (PSR ¶¶ 13, 96-98.)

1

The defendant's crime spree began, on August 16, 2017, when the defendant attempted to rob a branch of HSBC Bank located at 15 Union Square West (Count One).  (*Id.* at ¶ 66.)  The defendant approached a bank teller and presented a demand note, which stated, "I HAVE A GUN. GIVE ME MONEY."   The teller, Gina Ng, was instantly terrified because she did not know whether he had a weapon.  She pushed the demand note back through the window and backed up with her hands up.  As she backed up, she could see the defendant's mouth moving but due to her fear, she could not hear anything anymore.  She then went to a back room and nearly collapsed in panic as she told a co-worker what had happened.[1]   After the teller failed to comply with the defendant's threatening demands, the defendant fled the bank.

On or about August 16, 2017, the defendant robbed a branch of Chase Bank located at 1260 Broadway (Count Two).  The defendant approached a bank teller and presented a demand note, which stated, "HELLO! HAVE GUN WILL USE IT 100'S, 50'S, 20'S ALL OF IT!"  (*Id.* at ¶ 14; Aug. 7, 2018 Tr. 171.)[2]  The teller testified that as soon as she read the demand note she was in shock and became afraid.  In particular, she explained that her fear stemmed from the "fact that [she] could have been hurt from what the note said."  (PSR ¶ 14; Tr. at 172.)  At the time of the robbery, there were customers and bank employees in the bank who were not behind bulletproof glass like she was.  (PSR ¶ 14; Tr. at 173.)  Moreover, she explained that during the robbery the defendant used an "aggressive" tone and kept "tugging on a bag that he had on his shoulder," which she understood to mean that the defendant "had something in that bag that could possibly hurt [her] or one of [her] colleagues."  (PSR ¶ 14; Tr. at 172)  Specifically, she "believed [the

---

[1] The Government is including with its submission a video of the teller's reaction to the defendant's attempt to rob the bank.  *See* Exhibit A.  In addition, the teller has provided a victim impact statement for the Court's consideration, which is attached hereto as Exhibit B.

[2] All references to the trial transcript are referenced herein as "Tr."

defendant] had a gun." (*Id.*)  The teller passed the defendant approximately $1,500 and the defendant then fled.

On or about August 18, 2017, the defendant attempted to rob a branch of Chase Bank located at 2099 Broadway (Count Three).  The defendant approached a bank teller, and presented a demand note, which stated, "I HAVE A GUN I WILL USE IT 100'S, 50, 20, 5."  (PSR ¶ 15; Tr. at 121.)  As the defendant waited for the teller to comply with his ultimatum, he leered into the teller window, and appeared to aggressively speak to the teller while pointing into the teller area. (Tr. 121-22.)  The terrified teller did not comply.  The defendant then fled the bank.

On or about August 21, 2017, the defendant robbed a branch of Chase Bank located at 1860 Broadway (Count Four).  The defendant approached a bank teller and presented a demand note, which stated, "HELLO I AM ARMED GIVE ALL MONEY 100'S, 50'S, 20'S."  (PSR ¶ 67.) Although the teller tried to stall the defendant in order to pull the silent alarm, the defendant's aggressive demands for the money coupled with the teller's fear that the defendant had a gun ultimately led the teller to comply with the defendant's threatening demands.  The teller feared not only for the safety of other customers who were in the bank at the time, but also for his manager who was standing in close proximity to the defendant during the robbery.  The teller passed approximately $1,000 to the defendant and the defendant then fled.  (*Id.*)

On or about August 24, 2017, the defendant robbed a branch of Chase Bank located at 2219 Broadway (Count Five).  The defendant approached a bank teller and presented a demand note, which stated, "I HAVE A GUN I WILL KILL YOUR HOST IF YOU DO NOT GIVE ME THE MONEY."  (PSR ¶ 16; Tr. at 243.)  The teller testified that she felt "threatened" after reading this note, because the defendant was threatening to kill someone if she did not give him money.  (*Id.*)

3

The teller passed approximately $2,173 to the defendant and the defendant then fled.  (PSR ¶ 16; Tr. at 245.)

On or about August 29, 2017, the defendant attempted to rob a branch of Bank of America at 301 West 145 Street (Count Six).  The defendant approached a bank teller and passed her two demand notes, which stated, "I WILL KILL YOUR HOST IF YOU DO NOT GIVE ME ALL THE MONEY! IMMEDIATELY!", (Tr. 184),  and "I WILL KILL YOUR HOST IF YOU DO NOT GIVE ME MY MONEY! ALL OF IT! I AM ARMED I WILL KILL YOUR HOST IF I DO NOT GET MONEY ALL OF IT!"  (PSR ¶ 17; Tr. at 185.)  The teller explained that despite her training, when she received and read these notes, she became nervous because the defendant said "he was armed" and she understood that he would kill "anyone in the vicinity" if she did not comply.  (PSR ¶ 17; Tr. at 183-84.)  The teller was also scared because the defendant kept using her name repeatedly while making his demands and kept placing his backpack near the teller window, which caused her further concern as he had stated he was armed.  (PSR ¶ 17; Tr. at 185-86.)  After the teller explained to the defendant that she had to retrieve the money from the back, she walked away from the counter and did not comply.  (PSR ¶ 17; Tr. at 187.)  The defendant then fled the bank.

On August 29, 2017, the defendant robbed a branch of Bank of America located at 2077 Broadway (Count Seven).  The defendant approached a bank teller and presented a demand note, which stated, "I AM ARMED I WILL KILL YOUR HOST IF YOU DON'T GIVE ME ALL MONEY."  (PSR ¶ 18; Tr. at 55.)  After reading the note, the teller felt "afraid . . . [b]ecause [the defendant] said he was going to kill someone."  The teller testified that she "panicked and just wanted to get him out," so she gave him money.  (PSR ¶ 18; Tr. at 56.)  All in all, the teller gave the defendant approximately $ 8,050.  The defendant then fled the bank.

Following this last robbery, law enforcement agents were able to trace the defendant to a particular hotel in Manhattan by reviewing surveillance video showing the defendant traveling from the Bank of America located at 2077 Broadway to a neighborhood on the Upper West Side. (PSR ¶ 19; Tr. at 135-157.)  On August 30, 2017, pursuant to a judicially authorized search warrant, law enforcement agents searched a room in the hotel where the defendant had been residing.  (PSR ¶ 19; Tr. at 205.)   Among other things, law enforcement agents recovered clothing matching clothes the defendant wore during the robberies, pre-written bank notes, backpacks that appeared to be the same backpacks used during the robberies, and approximately $8,000 in cash.  (PSR ¶ 19; Tr. at 208-223.)

On August 30, 2017, the defendant was arrested on probable cause.  (PSR ¶ 19; Tr. at 157.) The following day, he was charged in a complaint, 17 Mag. 6596 (ECF No. 1, the "Complaint" or "Compl.") with one count of bank robbery, in violation of Title 18, United States Code, Section 2113(a).

On December 18, 2017, a grand jury sitting in this District returned an indictment, 17 Cr. 782 (AT) (the "Indictment").  The Indictment charged the defendant with committing four bank robberies (Counts Two, Four, Five, and Seven), three attempted robberies (Counts One, Three, and Six), and possessing and brandishing a firearm in furtherance of a crime of violence, specifically the bank robbery charged in Count Four (Count Eight),[3] in Manhattan during an approximately two-week period in 2017.

---

[3] On or about June 20, 2018, the Government informed defense counsel that it would not be proceeding on Count Eight as charged in the Indictment.  Following the defendant's conviction of Counts Two, Three, Five, Six and Seven, the Government agreed to dismiss Count Eight at the defendant's sentencing.  (Aug. 8, 2018 Tr. 433.)

On August 6, 2018, the Court severed Counts One and Four to be tried separately, and the parties proceeded to trial on Counts Two, Three, Five, Six, and Seven.  On August 8, 2018, a jury sitting in this District found the defendant guilty on Counts Two, Three, Five, Six, and Seven. Following the defendant's convictions, the defense agreed that the defendant's underlying conduct for Counts One and Four would be relevant conduct for purposes of sentencing.  (Aug. 8, 2018 Tr. 433.)

## II.     The Guidelines Calculation

As set forth below, the Government agrees with the Probation Department's Guidelines calculations for the defendant as set forth in the PSR.

### A.  The Probation Department Calculation

The Probation Department calculated the offense conduct guidelines as follows: the base offense level is 20 for each count the defendant was convicted of and each count formed its own group.  The Probation Department then added a two-level enhancement for each group based on the fact that the property of a financial institution was taken or was the object of the offense.  For Counts Five, Six, and Seven, the Probation Department also added a two-level enhancement for each of those groups due to the fact that a threat of death was made during the commission of the offense.  As there were multiple counts that the defendant was convicted of, there was a four-level enhancement based on the combination of the offense levels across the five groups, that is, the five counts that the defendant was convicted of.  Accordingly, the Probation Department calculated a combined offense level of 28.

However, the Probation Department concluded that the defendant is a career offender because (1) he was at least eighteen years old at the time he committed the instant offense; (2) the offense charged in Counts Two, Three, Five, Six, and Seven are felonies that are crimes of

6

violence; and (3) the defendant has at least two prior felony convictions for crimes of violence or controlled substance offenses, to wit, (a) on or about January 31, 2007, the defendant was convicted in New York County Supreme Court of Robbery in the Third Degree in violation of New York Penal Law § 160.05, a Class D Felony, for which he was sentenced to a term of 42 months' imprisonment to 7 years' imprisonment, and of Attempted Robbery in the Third Degree in violation of New York Penal Law § 160.05, a Class E Felony, for which he was sentenced to a term of 2 years' imprisonment to 4 years' imprisonment; and (b) on or about July 16, 1998, the defendant was convicted in New York County Supreme Court of Attempted Criminal Sale of a Controlled Substance in the Third Degree, in violation of New York Penal Law § 220.39, a Class C Felony, for which he was sentenced to a term of 5 years' to 10 years' imprisonment and a suspended license for 6 months, and he was released to parole on April 25, 2005.  Accordingly, the Probation Department calculated that his total offense level was 32 based on his status as a career offender.

The Probation Department also determined that the defendant was in criminal history category VI based on his status as a career offender,[4] resulting in an advisory guidelines range of 210 to 262 months' imprisonment.  (PSR ¶ 102, & pp. 25-27.)  The Probation Department has recommended a sentence of 210 months' imprisonment because of, among other reasons, the

---

[4] The Probation Office calculated that the defendant had seventeen criminal history category points, stemming in part from its determination that the defendant's convictions listed in paragraphs 93 and 96 each receive three criminal history points as they were intervening convictions.  As the defendant was not arrested for committing the first offense on May 2, 2012, (*see* PSR ¶ 93) prior to committing the second offense, which was alleged to have occurred on April 28, 2012 (*see* PSR ¶ 97), that is, there was no intervening arrest, and the sentences for the conduct underlying each of these arrests were imposed on the same day, that is, March 7, 2013, these sentences are treated as a single sentence under U.S.S.G. § 4A1.2(a)(2).  Accordingly, the defendant should have been assessed fourteen criminal history category points.  In any event, whether based on his career offender status or the number of criminal history points, the defendant is in criminal history category VI.

defendant's "prolific criminal history," "his inability to remain in the community without committing additional crimes," and "his propensity to commit crimes regardless of any past sanctions." (PSR at 25-27.)

The defendant disputes the Probation Department's conclusion that the defendant is a career offender, argues that the Probation Department inappropriately enhanced the defendant's offense level for certain counts due to the threat of death, and contends that the Probation Department inappropriately failed to apply a two-level reduction for acceptance of responsibility. For the reasons explained below, the Government believes the Probation Department's Guidelines calculation is correct.

### B.  The Probation Department Correctly Found that the Defendant is a Career Offender

The defendant contends that the Probation Department incorrectly calculated the Guidelines Range by finding that the defendant is a career offender based on its assessment that the defendant's July 16, 1998, conviction for attempted criminal sale of a controlled substance in the third degree in violation of New York Penal Law § 220.39, qualifies as a "controlled substance offense" under U.S.S.G. § 4B1.1(a).  According to the defendant, an extension of the Second Circuit's reasoning in *United States v. Townsend*, 897 F.3d 66 (2d Cir. 2018), requires the Court to find that the defendant's prior controlled substance offense under New York law actually constitutes a controlled substance offense, because New York's definition of "narcotic drug" is broader than the federal controlled substance schedules.

While the Government agrees with the defendant that, pursuant to the Second Circuit's decision in *Harbin v. Sessions*, 860 F.3d 58, 67 (2d Cir. 2017), the relevant statute is divisible down to its subsections, the relevant subsection here—the subsection criminalizing the sale and

possession of "narcotic drugs"—is not further divisible by type of narcotic drug.[5]   More fundamentally, the defendant's argument is foreclosed by controlling Second Circuit law.   In *Pascual v. Holder*, 707 F.3d 403, 405 (2d Cir. 2013), the Second Circuit applied the categorical approach to the New York state crime of criminal sale of a controlled substance in the third degree, in violation of N.Y. Penal Law § 220.39.   In doing so, the court held that criminal sale of a controlled substance in the third degree was an "aggravated felony conviction" because it proscribed conduct that was a felony under the federal Controlled Substances Act.   *Id.*; *see Heredia v. Sessions*, 865 F.3d 60, 62 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 677 (2018); *United States v. King*, 325 F.3d 110, 114-15 (2d Cir. 2003); *United States v. Ramirez*, 344 F.3d 247, 253-54 (2d Cir. 2003); *Espinal v. Lynch*, 665 F. App'x 65, 66-67 (2d Cir. 2016).   The *Townsend* decision did not purport to overturn the *Pascual* decision, which—unlike *Townsend*—directly addressed the crime of which the defendant was convicted.

Furthermore, the defendant's argument that the New York definition of "narcotic drug" is broader than the federal definition appears to depend on the current versions of the relevant schedules rather than the versions in place at the time of the defendant's convictions.   In 1998, when the defendant was convicted of his controlled substance offense, the geometric isomer of 3-methylfentanyl was a scheduled narcotic under both state and federal law.   *Compare* N.Y. Pub. Health Law § 3306(I)(b) (1998) *with* 21 C.F.R. § 1308.11(b)(34) (1998).   In addition, neither the state nor the federal schedule excluded "naldemedine" or "naloxegol" from the definition of opiate.

---

[5] In any event, the type of narcotic drug at issue in the defendant's 1998 conviction was cocaine, which is referenced in the indictment for that case.   The Government has attached that indictment hereto as Exhibit C.

Compare N.Y. Pub. Health Law § 3306(II)(b)(1) with 21 C.F.R. § 1308.12(b)(1) (1998).[6]  *See*
*United States v. Ferrer*, 17 Cr. 773 (JGK) (S.D.N.Y. 2018) (holding under *Townsend* that the New
York state definition of "narcotic drug" did not sweep more broadly than the analogous federal
definition in the Controlled Substances Act in effect at the time of the defendant's conviction in
2008 and accordingly the defendant's conviction under N.Y. Penal Law § 220.39(1) qualified as a
controlled substance offense under the federal sentencing guidelines).[7]

### C.  The Probation Department Correctly Applied the Threat of Death Enhancement

Assuming that the career offender guideline does not apply, which it does, the Court should
adopt the Probation Department's determination that the defendant made a death threat during the
commission of the robberies in Counts Five, Six, and Seven.  Indeed, the enhancement properly
applies to all counts of conviction, and the two additional bank robberies that are relevant conduct
as well.  Each demand note the defendant passed at the respective robberies contained some threat
of violence.  Many of these explicitly threatened death.  For instance, the notes he passed on August
24, 2017 and August 29, 2017, said that the defendant would "kill your host" if he did not receive
money.  Other notes merely suggested death: "I AM ARMED;" "HAVE GUN WILL USE IT;"
and similar threats.  The Guidelines do not require an unambiguous threat of death to apply this
enhancement.  *See* U.S.S.G. § 2B3.1(b)(2)(F) at cmt. n.6.  The Second Circuit has held that, in the
context of a bank robbery the phrase "I have a gun" is sufficient to qualify.  *See United States v.*
*Jennette*, 295 F.3d 290, 292 (2d Cir. 2002) (Jennette's statements ["I have a gun"] required the

---

[6] Neither the New York or federal schedules in effect in 1998 explicitly excluded naldemedine or
naloxegol because these drugs had yet to be patented for legitimate medical purposes or even
discovered, respectively.

[7] The Government has attached the Honorable John G. Koeltl's decision in *United States v.*
*Ferrer* to this submission as Exhibit D.

teller to draw a single inference—that is, that Jennette was willing to use the gun that he claimed to have, if the teller did not comply with Jennette's demand. This is a very small inferential step for a teller to make, particularly during the confusion and understandable anxiety of a robbery. Accordingly, we conclude that a reasonable teller, when faced with a bank robber who demands money and states that he has a gun, normally and reasonably would fear that his or her life is in danger."). There is no doubt that these demand notes meet the Second Circuit standard for "threat of death."

Nor can there be any dispute that these notes instilled a reasonable fear of death in the tellers. Ms. Ng practically lost control due to the panic she felt when she read the defendant's demand note. Other tellers testified at trial that they feared for their safety and the safety of others. Fear for their own safety alone—fear that the defendant would use a gun against them—satisfies the standard under section 2B3.1(b)(2)(F).

The defendant ignores the fear that these tellers felt for themselves, which was considerable, and instead, focuses on the tellers' fear that the defendant might also hurt other people, and claims that the Guidelines prohibit applying the "threat of death" enhancement when the threat is directed at someone other than the person who hears the threat. The Guidelines place no such limitation on this provision, and the defendant has cited no authority in support of his position. The commentary to section 2B1.3(b)(2)(F) simply says that the threat must "instill in a reasonable person, who is a victim of the offense, a fear of death." It does not say that it must be a fear of one's own death, and the Court should not read such language into the Guidelines. Moreover, the question is not whether these tellers felt fear for their own safety; it is whether a "reasonable person" would feel such fear. As noted above, the Second Circuit has held that this provision applies in similar circumstances, and the Court should do the same here.

11

### D. The Probation Department Correctly Declined to Apply the Acceptance of Responsibility Offense Level Reduction

The Court should deny any acceptance of responsibility based on the defendant's testimony.  The United States Sentencing Guidelines contemplates a two-level reduction for a defendant who "clearly demonstrates acceptance of responsibility for his offense."  *See* U.S.S.G. § 3E1.1.  The commentary to this section clarifies that "this adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt."  *Id.* at cmt. 2.  The Guidelines recognize that in rare instances, a defendant may qualify for the reduction even after trial; for instance, where the purpose of trial was to preserve a legal challenge.  "In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon *pre-trial statements and conduct*."  *Id.* (emphasis added).

At trial, the defendant contested the essential element for establishing his criminal liability—whether he knowingly committed the offense.  He did so by taking the stand and telling a farfetched story about mind readers forcing him to commit the bank robberies.  He further did so by introducing an exhibit purporting to show his sincere belief in mind readers.  And finally, he contested the criminality of his act through defense counsel, who, in closing, invited the jury to acquit the defendant because "the Government has not proven . . . the last piece of the puzzle, the piece the law requires they prove beyond a reasonable doubt, his state of mind."  (Tr. at 384.)  The jury declined that invitation, rejected his testimony, and convicted him on all counts.

Having lost that argument before the jury, the defendant raises it again in his sentencing submission, claiming that his honest testimony about his belief in mind readers established his acceptance of responsibility.  The Court need not determine whether the defendant's testimony

was sincere, because the defendant's pre-trial conduct has rendered him ineligible for the two-level reduction for acceptance of responsibility.

As the Guidelines make clear, those rare instances in which a defendant qualifies for the reduction after trial are judged on pre-trial statements and conduct.  In this case, the defendant gave no indication prior to trial that he would concede *any* element of his factual guilt, or that the trial was simply intended to preserve a legal challenge.  As the Court will recall, defense counsel requested a lengthy adjournment in March 2018 to evaluate the defendant's mental health.  (Dkt. 18.)[8]  Given the overwhelming evidence in this case, the Government on multiple occasions asked defense counsel for notice of any defense that might bear on insanity, diminished capacity, incompetence, or some other aspect of the defendant's mental wellbeing.  Defense counsel repeatedly assured the Government that the defendant would raise no such defense.

The Court will also recall that defense counsel moved to dismiss the Indictment based on the Government's failure to provide information relating to eyewitness identifications in advance of trial.  (Dkt. 37.)  Again, at no point in that briefing did defense counsel concede the defendant's factual guilt, or preview that the defendant would admit to the conduct at trial.  Instead, the motion argued that the defendant had been prejudiced by his inability to raise an identity defense.

Indeed, even at trial the defendant made no indication that he was admitting his responsibility for the offense.  In the opening statement, defense counsel stated that there would be "glaring holes" in the evidence that would "ruin the Government's case."  (Tr. at 47.)  Likewise, the defendant's testimony, far from admitting his guilt, provided the jury an innocent explanation

---

[8] The Probation Department requested the results of any evaluations of the defendant's mental health from defense counsel in order to incorporate those results into its Guidelines calculation and sentencing recommendation, but was not given those evaluations in advance of completing its final presentence report.  (PSR ¶¶ 21, 22, 123 & pp. 26-27.)

for his behavior—that it was literally out of his control.  Indeed, the defendant closed his direct examination by stating, "it was not of my own volition. I did not do this on my own will."  (Tr. at 269.)  There can be no clearer denial of responsibility under criminal law.

Defense counsel, far from disclaiming the defendant's explanation, adopted it in arguments to the Court and before the jury.  During a discussion outside the presence of the jury, defense counsel informed the Court that "[t]he Government still has to prove *mens rea*."  (Tr. at 270.)  At that time, defense counsel was not arguing that the defendant had in fact committed the crime and accepted responsibility for it.  And defense counsel closed with the argument that "the Government's evidence must be so compelling that you are convinced of Mr. Frierson's state of mind beyond a reasonable doubt"—again, contesting a key element of the crime.  (Tr. at 382.)  It was not until April 1, 2019, when the defendant submitted his sentencing submission, that he first claimed to have accepted responsibility for the offense.  All of his actions and the actions of defense counsel both before the trial and during the trial belie that claim.

Moreover, the case the defendant cites in support of his position, *United States v. Sewell*, 252 F.3d 647 (2d Circ. 2001), relates to whether a *legal* challenges to *mens rea*—a challenge raised in advance of trial—bars a defendant from qualifying for the two-level reduction under U.S.S.G. § 3E1.1. That situation does not apply here, and thus there are no grounds for applying the two-level reduction to this case.

### III.   Discussion

Consistent with the recommendation of the Probation Department, the Government respectfully submits that a sentence that includes a substantial period of incarceration is appropriate for the defendant and would be sufficient but not greater than necessary to promote

the legitimate goals of sentencing.   Indeed, consideration of the factors set forth in 18 U.SC. § 3553(a) militates strongly in favor of a substantial custodial sentence.

### A.   A Sentence of Incarceration is Necessary to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Impose Just Punishment

A sentence of incarceration is necessary to reflect the nature and seriousness of the offense conduct and the magnitude of the harm the defendant caused.  *See* 18 U.S.C. § 3553(a)(1) & (2)(A).

#### 1.   *The Defendant's Conduct Caused Substantial Harm*

First, the seriousness of the defendant's offense is reflected in the significant harm it caused not simply to the banks who lost money but more importantly to the tellers who were each terrorized by the defendant's conduct.  Every teller who testified at the trial expressed feeling frightened, scared, and threatened by the defendant's conduct, particularly as on each occasion, he threatened violence by claiming he was armed or had a gun.  The tellers uniformly explained that while they were afraid for themselves they were also afraid for the other innocent customers and bank employees who were exposed to the inherently dangerous situation that the defendant created on the bank floor.

The ramifications of the defendant's offense conduct is exemplified by Ms. Ng's reflections on the day he tried to rob her (Count One).  In particular, she explains it was "one of the worst day[s] of [her] life" and that she has since been "depressed" and "very scared" for herself, her co-workers and customers.  *See* Exs. A & B.  While Ms. Ng hopes to regain her "self-confidence," the defendant's actions terrified her and the ripple effects from that fateful interaction has left Ms. Ng. indelibly scarred.  Similarly, Ms. Vega, who was the bank teller that the defendant aggressively confronted on August 18, 2017 (Count Three),                                                        following the defendant's attempted robbery.   Ms. Vega's life was forever altered by the defendant's actions and                                                         The victim bank tellers from the

defendant's six other robberies also reported varying degrees of emotional consequences from their encounters with the defendant.

The defendant's repeated claims that his convictions were "in practice, wholly non-violent"[9] and that "no one got hurt" is contradicted by the trial record and the subsequent ramifications reported by the victims of his crimes.  (Def. Sub. 2.)  The defendant caused substantial damage through his conduct, damage that he appears unwilling to fully acknowledge and accept responsibility for.  And that damage counsels strongly in favor of a substantial custodial term.

### 2.   *The Defendant's Conduct Was Repeated*

Second, the defendant's conduct was hardly the result of a single mistake or lapse in judgment but was yet another episode in the defendant's extensive criminal history.  As explored in the Government's rebuttal case during trial, this was not the first time the defendant had committed similar bank robberies.  In 2007, the defendant was found guilty after a trial in New York Supreme Court of three counts of Robbery in the Third Degree, one count of Attempted Robbery in the Third Degree, and three counts of Criminal Possession of Stolen Property in the Fourth Degree, all felonies.  He was sentenced to 42 months to 7 years' imprisonment on the three counts of Robbery in the Third Degree, 2 years to 4 years on the one count of Attempted Robbery

---

[9] The defendant similarly claims that his prior convictions were similarly "non-violent" but again this is belied by the trial record and his criminal history.  For example, the defendant's prior convictions in 2007 related to bank robberies that the defendant committed, and in each of those instances the defendant threatened the bank tellers with violence and explained he was armed with a gun.  The damage the defendant inflicted on those bank tellers, and the extended consequences thereof, will never be fully known by the Government or this Court, however, to characterize the defendant's actions as "non-violent" belies the threats he made to each of those bank tellers.  Similarly, the defendant was convicted of battery in 1997 in Broward County, Florida as a result of intentionally grabbing a victim and slapping her in the face.  Again, the defendant's actions cannot be characterized as "non-violent."

in the Third Degree, and 18 months to 3 years on the three counts of Criminal Possession of Stolen Property in the Fourth Degree (the "2007 Convictions"). In his prior robberies, as well as the current robberies and attempted robberies that the defendant stands convicted of, the defendant entered a retail bank branch in Manhattan, including one of the bank branches at issue in this case, without a disguise, approached the counter, presented the teller with a note demanding money and threatening them with a gun, and waited for the teller to comply before fleeing the premises. As the jury found in convicting the defendant of the bank robberies in this case, this evidence forcefully rebuts any argument that the defendant lacked criminal intent when he engaged in the same conduct approximately eleven years later. He knew what he was doing and he knew the consequences of his actions, and yet he still engaged in these actions without an ounce of care for the innocent victims involved.

As the Probation Department concluded, the defendant's inability to remain in the community without committing additional crimes and the substantial damage he has caused through his actions to innocent victims warrants a meaningful term of incarceration. As such, a sentence below the Guidelines range, but including a substantial term of imprisonment, is necessary to reflect the seriousness of the defendant's conduct, to provide just punishment for the offense, and to reflect his life-long disrespect for the law.

**B. A Sentence of Incarceration is Necessary to Promote General Deterrence and Ensure the Safety of the Community**

An incarceratory sentence is also necessary to promote deterrence. *See* 18 U.S.C. § 3553(a)(2)(B). This is the defendant's fourteenth criminal conviction; his prior crimes have resulted in sentences ranging from conditional discharge to 5 to 10 years' imprisonment. Sadly, none of these sentences has deterred the defendant. Rather, over time the defendant's crimes have increased in severity and frequency. This culminated with the defendant committing the instant

offenses only a month after being released from a substantial prison sentence.  In light of the defendant's criminal history, there is little reason to believe any prison sentence will deter him. Nevertheless, a sentence of incarceration will send a message to others that the penalties for bank robbery are serious, and that repeated criminal acts will result in increasingly serious punishments. Moreover, incarceration will ensure, at least for the period of the defendant's incarceration, that he does not further endanger the community.

### C.  The Defendant's Medical Condition

As described in the defendant's sentencing submission, the defendant's health has deteriorated rapidly while in custody due to his stage IV colon cancer.  The Government recognizes that this has added to the burden of his incarceration and that the prospect for full recovery is unlikely.  The defendant has not, however, identified any characteristic of his treatment that could not be addressed while the defendant is incarcerated.  Moreover, while the defendant cites 18 U.S.C. § 3582(d)(1) and U.S.S.G. § 1B1.13 as counseling for early release given his stage IV cancer, the Guidelines only allow for early release when the defendant "is not a danger to the safety of any other person or to the community."  U.S.S.G. § 1B1.13(2).  Sadly, given the defendant's past history and his disregard for his own wellbeing and the wellbeing of others, the Government is concerned that release, even in his current state, could lead to further criminal activity.  The Bureau of Prisons is better positioned to evaluate whether the defendant qualifies for early release under 18 U.S.C. § 3582(d)(1).

### IV.  Conclusion

For the reasons set forth above, the Government respectfully submits that, a sentence of incarceration below the Guidelines Range, but including a substantial term of imprisonment, is

appropriate on these facts and would be sufficient but not greater than necessary to further the

legitimate purposes of sentencing.

Respectfully submitted,


GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York

By:      /s/
Aline R. Flodr
Sheb Swett
Sagar K. Ravi
Assistant United States Attorneys
(212) 637-1110 / 6522 / 2195

19

# EXHIBIT B

Your Honor,

My name is Gina Ng, I have been in banking as a teller for 13 years.  In all my years of service I have never been robbed until that fateful day on 08/16/2017.  That was one of the worst day of my life, when that person handed me the note saying that he has a gun, give me 100 and 50's. I was shocked and scared that all I can do was walk away. And after that day I became depressed and always looking in my back whenever I'm walking outside. I don't want to feel very scared anymore for myself my co employees and customers.  I want to take my confidence back in doing my job as a teller in helping clients and looking forward in the future to be more safe and have more self confidence.

Thank You very much your Honor,

Gina Ng
HSBC Bank Teller

# EXHIBIT C

SUPREME COURT OF THE STATE OF NEW YORK
CITY OF NEW YORK
COUNTY OF NEW YORK
CRIMINAL TERM:  SPECIAL NARCOTICS PARTS
----------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK     :

     -against-     :

DAVID WATSON,        :

       Defendant. :
----------------------------------------X

  THE GRAND JURY OF THE SPECIAL NARCOTICS COURTS OF THE CITY OF NEW YORK, by this indictment, accuses the defendant of the crime of CRIMINAL SALE OF A CONTROLLED SUBSTANCE IN THE THIRD DEGREE, committed as follows:

  The defendant, in the County of New York, City of New York, on or about March 20, 1998, knowingly and unlawfully sold to a police officer known to the Grand Jury, a narcotic drug, to wit, cocaine.

SECOND COUNT

  AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of CRIMINAL POSSESSION OF A CONTROLLED SUBSTANCE IN THE THIRD DEGREE, committed as follows:

  Said defendant, in the County of New York, City of New York, on or about March 20, 1998, knowingly and unlawfully possessed a narcotic drug, to wit, cocaine, with intent to sell the same.

THIRD COUNT

  AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of CRIMINAL POSSESSION OF A CONTROLLED SUBSTANCE IN THE SEVENTH DEGREE, committed as follows:

Said defendant, in the County of New York, City of New York, on or about March 20, 1998, knowingly and unlawfully possessed a controlled substance, to wit, heroin.

BRIDGET G. BRENNAN
Acting Special Assistant District Attorney

Counsel

aml #97 (4/9/98, Pt. 70)
No.  98N028201


Filed      day of      , 1998          THE PEOPLE OF THE STATE OF NEW YORK

Pleads
                                              -against-


                                       DAVID WATSON,

Bail
                                                            Defendant.
                                       _____

                                                 INDICTMENT

                                       CRIMINAL SALE OF A CONTROLLED SUBSTANCE
                                              IN THE THIRD DEGREE
                                       CRIMINAL POSSESSION OF A CONTROLLED SUBSTANCE
                                              IN THE THIRD DEGREE
                                       CRIMINAL POSSESSION OF A CONTROLLED SUBSTANCE
ADA KRISCHEL/PART 70/80                        IN THE SEVENTH DEGREE


                                       _____
                                       P.L. § 220.39, P.L. § 220.16, P.L. § 220.03

                                                BRIDGET G. BRENNAN
                                       Acting Special Assistant District Attorney


                                                A TRUE BILL

                                                       Foreman

                                                                        skk

# EXHIBIT D

IbjWferS

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        17 Cr. 773 (JGK)

5   GREGORY FERRER,

6

7              Defendant.               Sentence

8   ------------------------------x
                                        New York, N.Y.
9                                       November 16, 2018
                                        2:30 p.m.
10

11  Before:

12
                     HON. JOHN G. KOELTL,
13
                                        District Judge
14
                         APPEARANCES
15
    GEOFFREY S. BERMAN
16       United States Attorney for the
         Southern District of New York
17  BY:  NI QIAN
         CECILIA E. VOGEL
18       Assistant United States Attorneys

19
    DAVID E. PATTON
20       Federal Defenders of New York, Inc.
         Attorney for Defendant
21  BY:  MARTIN S. COHEN
         DANIEL G. HABIB
22       Assistant Federal Defenders

23

24

25

IbjWferS

```
1          (Case called)

2          THE COURT:  Good afternoon, all.  Please be seated.

3          MS. QIAN:  Good afternoon, your Honor.  Ni Qian and

4   Cecilia Vogel, for the government.

5          MR. COHEN:  Good afternoon, your Honor.

6          THE COURT:  I'm sorry.  I thought Ms. Vogel would note

7   her appearance.

8          MS. VOGEL:  Oh.  Ms. Qian did note my appearance for

9   me.  Thank you, your Honor.

10         THE COURT:  OK.

11         MR. COHEN:  Good afternoon, your Honor.  Martin Cohen

12  and Daniel Habib, from the Federal Defenders, on behalf of

13  Gregory Ferrer.

14         THE COURT:  Good afternoon.  I note that the defendant

15  is present.

16         I've received the presentence report prepared May 7,

17  2018, revised June 5, 2018, together with the sentencing

18  recommendation and the addendum.  I've received the defense

19  submissions, dated September 17, October 5, October 16, and

20  another one on October 16.  I've received government

21  submissions dated October 11 and October 17, 2018.

22         I'll listen to all of the parties, as I regularly do,

23  checking to make sure that they've reviewed the presentence

24  report, the recommendation and the addendum, and that defense

25  counsel has discussed them with the defendant.
```

IbjWferS

1      Before I do that, because there has been briefing and

2  argument over the correct application of the guidelines in this

3  case, I'm going to begin with an explanation of my conclusions

4  with respect to the guidelines sentencing range.  It certainly

5  doesn't prevent the parties from raising any issues with

6  respect to that, after I've explained my conclusions.  And of

7  course, even after I've determined the appropriate guidelines

8  sentencing range, I'm going to listen to all of the parties

9  before I determine what the appropriate sentence is in the

10  case, because the guidelines sentencing range is only a

11  starting point for a determination of the appropriate sentence

12  in the case.

13      There is a dispute between the parties as to the

14  proper calculation of the guidelines sentencing range.  The

15  government contends that the base offense level is 24, under

16  guideline Section 2K2.1(a)(2) and 4B1.2(b) of the current

17  guidelines because the defendant committed the current offense

18  subsequent to sustaining at least two felony convictions of a

19  "controlled substance offense."

20      I should note that the current version of the

21  guidelines should be used, which is the November 2018 version,

22  unless there is an *ex post facto* problem.  The parties have not

23  suggested that there is any difference among the possible

24  versions of the guidelines on the relevant issues.

25      The government points to at least two New York State

IbjWferS

felony convictions in 2008 as felony convictions of a
"controlled substance offense," two counts of criminal sale of
a controlled substance on school grounds and one conviction for
third degree sale of a controlled substance, presentence report
paragraphs 32, 33 and 35.  The government, therefore, agrees
with the presentence report that the total offense level is 21,
after subtracting three levels for acceptance of
responsibility, the criminal history category is 6 and the
guidelines sentencing range is 77 to 96 months.

        The defendant contends that offense level 24 is not
warranted because the defendant's prior convictions under New
York State law are not "controlled substance offenses" under
the categorical approach to the definition of "controlled
substance offense," and therefore, the appropriate guideline is
14, under 2K2.1(a)(6), and after a two-level credit for
acceptance of responsibility, the offense level is 12, the
criminal history category is VI and the guidelines sentencing
range is 30 to 37 months.

        The parties agree that the Court should look to the
definition of a controlled substance offense under New York
State law in 2008, the time of conviction, but the agreement
ends there.  The defendant says that the Court should determine
whether the definition of controlled substance offense under
New York State law in 2008 is broader than the definition of a
controlled substance offense under federal law today.  Because

IbjWferS

1    New York State law, in 2008, covered three substances --

2    geometric isomers of 3-methylfentanyl, naloxegol and

3    naldemedine -- that are not covered by the federal Controlled

4    Substance Act today, the defendant argues that the state law is

5    broader than the federal law, and therefore, a conviction for

6    those offenses under state law is not a controlled substance

7    offense under the controlling federal statute.

8              The government argues that the state and federal

9    statutes must be compared at the time of conviction for the

10   state law offense, and in 2008, all three of the substances

11   relied on by the government -- I'm sorry.  Let me say that

12   again.

13             The government argues that the state and federal

14   statutes must be compared at the time of conviction for the

15   state law offense, and in 2008, all three of the substances

16   relied on by the defendant were, in fact, controlled under

17   federal law.  The government argues, therefore, that the state

18   law was no broader than the federal law, and therefore, the

19   state law convictions qualified as controlled substance

20   offenses under the guidelines.

21             In *United States v. Townsend*, 897 F.3d 66 (2d Cir.

22   2018), the Second Circuit Court of Appeals instructed that the

23   categorical approach is employed when determining whether the

24   defendant has committed prior controlled substance offenses, as

25   defined in Section 4B1.2(b) of the federal sentencing

IbjWferS

guidelines for purposes of setting a base offense level under
guideline 2K2.1A.  Thus, under *Townsend*, the Court is to
compare New York State's definition of "narcotic drug" with the
federal definition of "controlled substance," set out in the
Controlled Substances Act.  If the New York State definition is
broader than the federal definition -- that is, if the New York
State definition contains substances that the federal
definition does not -- then the state statutes of conviction do
not match the federal crimes, and guidelines Section
2K2.1(a)(2) cannot apply.

          In *Townsend*, the court looked to the New York State
statute at the time of conviction and found that it was broader
than the federal statute because it covered HCG, a substance
not covered by the federal Controlled Substances Act.
Therefore, a violation of the state statute did not qualify as
a "controlled substance offense" under the federal sentencing
guidelines.  However, while *Townsend* looked at the state
statute at the time of conviction, the court did not attempt to
explain whether there was any relevant difference in the
federal statute at the time of conviction for the controlled
substance offense and at the time of sentencing for the federal
offense.  That is the matching issue that is raised in this
case.

          The parties agree that the state and federal
definitions matched in 2008, when Mr. Ferrer was convicted of

IbjWferS

1    the state offenses, but the defendant points out that now, at

2    the time of Mr. Ferrer's sentencing, the New York State

3    definition contains three substances not in the federal

4    definition and, thus, is broader than the federal definition.

5    Whether Section 2K2.1(a)(2) applies to Mr. Ferrer, therefore,

6    depends on whether the state definition of a "narcotic drug" is

7    matched against the version of the federal statute that existed

8    at the time of conviction for the state offense, or whether it

9    must be matched against the current version of the federal

10   statute.

11       The defendant argues that because 18 U.S.C. Section

12   3553(a)(4)(A)(ii) and guideline 1B1.11(a) direct the Court to

13   apply the version of the guidelines manual in effect at the

14   time the defendant is sentenced, the Court must use the current

15   federal definition of controlled substance offense to see if it

16   matches the definition of "narcotic drug" that existed in New

17   York State law in 2008.  But there is nothing in the statute or

18   the guidelines that supports the defendant's argument.

19       The current version of the guidelines is being used,

20   and it provides for an offense level of 24 if the defendant is

21   convicted of being a felon in possession of a firearm after

22   having previously been convicted of two controlled substance

23   offenses.  There is nothing in the guidelines that suggests

24   that the Court should look at the New York State statute at the

25   time of the prior convictions and match it against the federal

definition of controlled substances offenses.  Indeed, the

defendant's argument is inconsistent, because *Townsend* requires

the Court to look back at the New York State law at the time of

the prior controlled substance offense convictions, and there

is no explanation why the guidelines require the Court to look

back to the time of the prior convictions for the definition of

a narcotic offense under the state law and ignore the federal

law at the time to which it is being matched.

There is no case directly on point that is cited by

the parties.  The prior cases from the Court of Appeals, such

as *Pascual v. Holder*, 707 F.3d 403, 405 (2d Cir. 2013), found

that violations of the New York State statutes were controlled

substance offenses, but they did not deal with this specific

matching issue.  The closest case, and one which is persuasive,

is *Doe v. Sessions*, 886 F.3d 203 (2d Cir. 2018).  In that case,

the Second Circuit Court of Appeals held that for purposes of

determining whether a prior federal conviction was a controlled

substance offense that required removal under the Immigration

and Nationality Act, courts must look to the version of the

Controlled Substances Act in effect at the time of the

defendant's conviction.

In that case, the petitioner argued that in employing

the categorical approach, the court should determine whether

the offense of conviction matched the violation of the

Controlled Substances Act at the time of removal.  Because the

IbjWferS

Controlled Substances Act at the time of conviction covered
naloxegol, which was no longer covered by the Controlled
Substances Act at the time of removal, the petitioner argued
that the statute was broader at the time of conviction and
therefore was not a controlled offense at the time of removal.
In other words, the petitioner was arguing for the same
mismatch advocated by the defendant here.

The Court of Appeals rejected that proposition.  As
the court explained, "in employing the categorical approach to
determine whether state drug offenses constitute felonies
punishable under the Controlled Substances Act, the Supreme
Court, this court, and the BIA had previously assumed that an
alien's removability depends on whether a state drug schedule
sweeps more broadly than the Controlled Substances Act
schedules in force at the time of the alien's conviction, and
not at the time that his removal proceedings are initiated."
*Id.* at 208.  There is no reason why this holding should not be
applied in this case.  Substances are constantly added and
removed from the Controlled Substances Act.  When guidelines
Section 2K2.1(a)(2) applies to the defendant should not be
based on the fortuity of when the defendant is sentenced.

Moreover, applying the version of the state and
federal drug definitions in effect at the time of conviction
for the underlying state offense allows both the government and
the defendant to anticipate the sentencing consequences

IbjWferS

```
1    attached to a conviction.  While the defendant points out that
2    Doe is an immigration case and not an interpretation of the
3    guidelines, the categorical approach that was at issue in Doe
4    is the same categorical approach that is used across cases
5    dealing with immigration, the criminal code and the guidelines.
6    Doe and Townsend indicate that the Court must apply the New
7    York State definition of narcotic drug and the analogous
8    federal definition in the Controlled Substances Act in effect
9    at the time of Mr. Ferrer's 2008 convictions.
10           The parties do not dispute that these definitions are
11   a categorical match at that time.  Because the New York State
12   definition does not sweep more broadly than the federal
13   definition, the base offense level is 24, set out in Section
14   2K2.1(a)(2) of the guidelines, and applies to Mr. Ferrer.
15   Therefore, the offense level is 21, after a three-level
16   reduction for acceptance of responsibility, the criminal
17   history category is VI and the guidelines sentencing range is
18   77 to 96 months.
19           All right.
20           Yes, Mr. Cohen.
21           MR. COHEN:  Could I just have one moment, your Honor?
22           THE COURT:  Sure.
23           MR. COHEN:  Thank you, your Honor.
24           I just want to reiterate our objection as set forth in
25   our prior briefings and argument.  Thank you.
```

IbjWferS

1        THE COURT:  I'm sorry.  Your prior briefing and?

2        MR. COHEN:  And the argument from last month to

3  preserve it.

4        THE COURT:  Oh, sure.

5        MR. COHEN:  Thank you, your Honor.

6        THE COURT:  Moving on to the next step, as I said,

7  Mr. Cohen, have you reviewed the presentence report, the

8  recommendation and the addendum and discussed them with

9  defendant?

10        MR. COHEN:  I have, your Honor.  We reviewed the

11  report with Mr. Ferrer.  We have no objections.

12        THE COURT:  No.

13        MR. COHEN:  Sorry.

14        THE COURT:  My next question is other than the

15  objection which you've already noted, do you have any

16  objections?

17        MR. COHEN:  No, your Honor.

18        THE COURT:  OK.  Now I'll listen to you for anything

19  that you would like to tell me in connection with sentence, any

20  statement you'd like to make on behalf of the defendant,

21  anything at all you would like to tell me.

22        MR. COHEN:  Thank you very much, your Honor.

23        I wanted to start by letting the Court know that

24  Mr. Ferrer's mother, Rosita Ferrer, is here today.  She's been

25  at every court appearance and has written to the Court and is